

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

CROW TRIBE OF INDIANS, and
THOMAS L. TEN BEAR,

Plaintiffs,

v.

Case No.  1:92-CV-01002-ABJ

CHUCK REPSIS, individually; BRIAN
NESVIK, individually, and as Director
of the Wyoming Game & Fish
Department, and as Director of the
Wyoming Game & Fish Commission,[1]

Defendants.

## ORDER ON PLAINTIFFS' *MOTION FOR PARTIAL RELIEF FROM JUDGMENT* [ECF No. 69]

**THIS MATTER** comes before the Court on Plaintiffs' *Motion for Partial Relief from Judgment* ("*Motion*") (ECF No. 69). We previously held that we lacked the power to grant relief from the United States Court of Appeals for the Tenth Circuit's judgment in *Repsis II* because it relied on alternative grounds in its affirmance of *Repsis I*—*i.e.*, the Occupation and Conservation Necessity Rationales.[2] The Tenth Circuit vacated our decision and remanded for further proceedings. After considering the Tenth Circuit's direction, reviewing the *Motion*, the filings, the applicable law, and being otherwise fully

---

[1] When this action was brought, Francis Petera was the Wyoming Game & Fish Director; however, pursuant to Federal Rule of Civil Procedure 25(d), Brian Nesvik was automatically substituted as a party. Fed. R. Civ. P. 25(d).

[2] *See infra* pp. 6–7.

advised, Plaintiffs' *Motion* shall be **GRANTED IN PART**, and as a result, we shall **VACATE** the Occupation Rationale under Federal Rule of Civil Procedure 60(b)(5).

## INTRODUCTION

Treaties formed between American Indian[3] tribes and the United States are, in essence, inter-sovereign contracts. *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (quoting *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 675 (1979)). Inherent in their formation is a recognition that the tribes themselves are "distinct, independent political communities" imbued with a degree of sovereignty. *Worcester v. Georgia*, 31 U.S. 515, 559 (1832). And while tribal nations are beholden to the federal government's authority, treaties are the supreme law of the land and require express congressional abrogation for the rights therein to be extinguished. *See* U.S. Const. art. VI, § 2, cl. 2. Tribal members hold treaty-based rights communally; meaning, "[e]ach tribe member has the right to exercise the reserved rights, subject to tribal regulation, and to sue to enforce those rights." FELIX COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 18.04[1], at 1164 (2012) [hereinafter COHEN'S HANDBOOK].

---

[3] At times, we use the word "Indian" in this order to describe members of the Crow Tribe or to generally discuss concepts of American Indian jurisprudence. However, the Court is aware of the longstanding discourse surrounding that word's usage as well as preferences for alternative collective nouns. *See, e.g.*, Michael Yellow Bird, *What We Want to Be Called: Indigenous Peoples' Perspectives on Racial and Ethnic Identity Labels*, 23 AMERICAN INDIAN QUARTERLY 1, 1–21 (1999) ("'American Indian' and 'Native American' are the most common racial and ethnic labels used to identify the general population of Indigenous Peoples in the United States. However,…neither term has been without controversy, and no clear consensus exists on which label is most preferable."); *see also* Brooke Bauer & Elizabeth Ellis, *Indigenous, Native American, or American Indian? The Limitations of Broad Terms*, 43 JOURNAL OF THE EARLY REPUBLIC, 61 (2023) ("[T]he issue of how to talk about and categorize the multiplicity of Indigenous peoples of North America remains a critical issue in both historical scholarship and contemporary political and social conversations.").

2

This particular case involves the State of Wyoming ("Wyoming") and the Crow Tribe of Indians[4] ("Tribe" or "Crow Tribe"), and it signals another chapter in our disharmonious history—a history where courts have struggled to parse the seemingly incongruous nature of usufructuary[5] rights and state sovereignty.[6]

Beginning in January of 1992, the Tribe sued Wyoming Game and Fish officials seeking a declaratory judgment regarding their treaty hunting rights. This Court, relying on *Ward v. Race Horse*, held that by virtue of Wyoming's admission to the Union the Crow Tribe's treaty rights had been extinguished. The Tenth Circuit affirmed, and the Supreme Court denied certiorari.

Now, *Race Horse* has been overturned by *Herrera v. Wyoming*. 139 S. Ct. 1686, 1697. In *Herrera*, the Supreme Court held "*Race Horse* is repudiated to the extent it held

---

[4] *See* Brief of The Crow Tribe of Indians as Amicus Curiae in Support of Petitioner, *Herrera v. Wyoming*, 139 S. Ct. 1686 (2019) (No. 17-532 at 1) ("[T]he Crow Tribe of Indians…is a sovereign, federally-recognized Indian tribe with more than 14,000 enrolled citizens. More than 9,000 of those tribal citizens reside on the Crow Indian Reservation… located in southern Montana, adjacent to…the State of Wyoming…(to the south). The Tribe is governed by the Crow Tribal General Council, consisting of all adults of the Tribe, through an elected tripartite government with executive, legislative, and judicial branches.").

[5] *Usufruct*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A right for a certain period to use and enjoy the fruits of another's property without damaging or diminishing it, but allowing for any natural deterioration in the property over time."); *see also* R.W. Leage, *Roman Private Law* 181–82 (C.H. Ziegler ed., 2d ed. 1930) ("*Usufructus* is…the right of using and enjoying property belonging to another provided the substance of the property remained unimpaired."); *see, e.g., Sokaogon Chippewa Cmty. v. Exxon Corp.*, 805 F. Supp. 680, 701 (E.D. Wis. 1992) ("Usufructuary rights like hunting and fishing imply temporary presence and minimal physical occupation of the land.").

[6] *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 208 (1999) ("Indian treaty-based usufructuary rights are not inconsistent with state sovereignty over natural resources."); *see also* COHEN'S HANDBOOK § 18.07[5] (citations omitted) ("[T]he *Mille Lacs* decision determined, the two [(treaty-based usufructuary rights and state sovereignty over resources)] are compatible, because the federal government acted pursuant to its constitutional powers in entering into the treaty and because the judicial 'conservation necessity' standard allowing some state regulation of tribal treaty rights adequately protects states' interest in their natural resources."); *see Herrera v. Wyoming*, 139 S. Ct. 1686, 1700 (2019) ("Wyoming cannot rely on *Race Horse* to equate occupation with statehood, because that case's reasoning rested on the flawed belief that statehood could not coexist with a continuing treaty right.").

3

that treaty rights can be impliedly extinguished at statehood." *Id.* Based on *Herrera*, the Tribe asked this Court to vacate its prior judgment under Federal Rule of Civil Procedure 60(b). We denied the Tribe's *Motion.* ECF No. 84. The Tenth Circuit vacated our order and remanded. Now, this Court is tasked with evaluating "the merits of the Tribe's Rule 60(b) motion in the first instance." ECF No. 98-2 at 27.

## BACKGROUND

### I. *Repsis I & Repsis II*

***A. In* Repsis I, *we found that while* Race Horse *was a "much-criticized decision," it remained binding precedent and was dispositive in determining whether the Tribe's treaty-based hunting rights were extinguished upon Wyoming's statehood.***

The Tribe first brought this action asking the Court to determine the scope of the Tribe's hunting rights under the Second Treaty of Fort Laramie executed on May 7, 1868 ("Treaty" or "1868 Treaty"). *Id.* at 2; *see* ECF No. 1. The Treaty provides in relevant part:

> The Indians herein named agree, when the agency-house and other buildings shall be constructed on the reservation named, they will make said reservation their permanent home, and they will make no permanent settlement elsewhere, but *they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts.*

Treaty Between the United States of American and the Crow Tribe of Indians, Art. IV, 15 Stat. 650, (May 7, 1868) (emphasis added). In essence, the Crow Tribe agreed to give up its nomadic lifestyle and vast territory for, *inter alia,* a "permanent home" on the

4

reservation and the right to hunt on the unoccupied lands of the United States.[7] The ambit of these treaty hunting rights, however, has led to a great deal of contention and litigation. Today, and when this action was originally brought, the Crow Tribe asks this Court to determine what precisely those rights entail.

The underlying incident giving rise to this action occurred in 1989. Thomas L. Ten Bear ("Mr. Ten Bear")—Crow Tribe member and Plaintiff in this action—was hunting on the Tribe's Montana reservation when he crossed over into a section of the Bighorn National Forest in Wyoming. ECF No. 98-2 at 4–5. Mr. Ten Bear killed an elk and was subsequently charged with taking an elk without a hunting license on National Forest lands. *Id.* at 5. In defense of this charge, Mr. Ten Bear, along with the Tribe (collectively "Plaintiffs"), sued the Game and Fish in the District of Wyoming seeking a declaratory judgment. Specifically, they sought a judgment holding all Crow Tribe members retain "an off-reservation right to hunt on unoccupied and public lands under the 1868 treaty that could not be impeded by Wyoming's hunting and fishing laws." *Id.* (citation omitted).

This Court, in what has been dubbed *Repsis I*, granted Wyoming's motion for summary judgment relying on the Supreme Court's decision in *Ward v. Race Horse*, 163 U.S. 504 (1896). *See Crow Tribe of Indians v. Repsis*, 866 F. Supp. 520, 522–24 (D. Wyo. 1994) [hereinafter *Repsis I*]. We found that while *Race Horse* was a "much-criticized decision" it remained controlling; and as such, the Tribe's Treaty hunting rights had been

---

[7] All told, the Crow Tribe ceded ownership of more than 30 million acres, and in return the "8-million acre reservation for the crows" was established. *Herrera*, 139 S. Ct. at 1692 (citing *Montana v. United States*, 450 U.S. 544, 547–48 (1981)).

5

annulled when Wyoming was admitted to the Union.[8] *Id.* at 523; ECF No. 98-2 at 5. Going forward we will refer to this as the "Statehood Holding."

### B. In Repsis II, *the Tenth Circuit affirmed the Statehood Holding and offered two additional rationales.*

On appeal, the Tenth Circuit, in *Repsis II*, chided this Court's reluctance to follow *Race Horse. See Crow Tribe of Indians v. Repsis*, 73 F.3d 982, 987–93 (10th Cir. 1995) [hereinafter *Repsis II*]. The Tenth declared that "*Race Horse* is alive and well," and opined that Justice Edward Douglass White's majority was "compelling, well-reasoned, and persuasive." *Id.* at 994. Then the Tenth Circuit went beyond our decision, offering two additional grounds for its affirmance—the "Occupation Rationale" and the "Conservation Necessity Rationale." The Tenth Circuit later offered this succinct summary of those rationales:

> As "an alternative basis for affirmance" we held that, even if the Tribe had maintained its treaty right past the creation of the State of Wyoming, "the creation of the Big[horn][9] National Forest resulted in the 'occupation' of the land." Accordingly, the Treaty's provision of hunting rights on "unoccupied lands" did not apply to the Bighorn National Forest. We refer to this language in *Repsis II* as the "***Occupation Rationale***."

> Moreover, we recognized as a general matter that "states may regulate off-reservation treaty rights 'in the interest of conservation, provided the

---

[8] Here, we cited to Cohen's Handbook to support the proposition that *Race Horse* was "an anomaly, probably the only case where the Court has held an Indian treaty right extinguished based on doubtful and ambiguous expressions of Congressional intent." *Repsis I*, 866 F. Supp. at 523 (quoting COHEN'S HANDBOOK Ch. 5 § A4, at 268 n.73 (1982); *see also* COHEN'S HANDBOOK § 18.07[4], at 1198 ("[*Race Horse*'s] holding was called into question as early as 1905, and expressly repudiated by the Court in the 1999 case of [*Mille Lacs*].").

[9] We note that the Supreme Court in *Race Horse*, this Court in *Repsis I*, and the Tenth Circuit in *Repsis II*, all referred to the "Big Horn National Forest"—with a space between "Big" and "Horn." However, the name of the forest was officially changed to the "Bighorn National Forest" (with no space) by executive order in 1908. *See* Exec. Order No. 908 (July 2, 1908). As such, we will use the official spelling in this order and correct the prior spellings with brackets.

6

regulation meets appropriate standards and does not discriminate against the Indians.'" In discussing the continued applicability of *Race Horse*, we noted in closing that even if the tribal treaty in question "had reserved a continuing right which had survived Wyoming's admission, we hold there is ample evidence in the record to support the State's contention that its regulations were reasonable and necessary for conservation." We refer to this language in *Repsis II* as the "***Conservation Necessity Rationale***."

ECF No. 98-2 at 6–7 (emphasis added) (citations omitted) (quoting *Repsis II*, 73 F.3d at 992–94).

Based on the Occupational Rationale, the Conservation Necessity Rationale, and the Statehood Holding, the Tenth Circuit affirmed this Court's decision. *Id.* The Supreme Court denied certiorari, and in 1996 the judgment became final. *Id.* (citing *Crow Tribe of Indians v. Repsis*, 517 U.S. 1221, 116 S. Ct. 1851 (1996)).

## II.   *Herrera v. Wyoming*

The denial of cert seemed to spell a resolution, but as the Tenth Circuit later noted, "this was not the end of the story." *Id.* at 2. "Nearly 25 years later the Supreme Court decided *Herrera v. Wyoming*,…in response to Wyoming's attempts to prosecute a Tribe member for hunting in the Bighorn National Forest." *Id.* at 2–3. In *Herrera*, just as in the instant case, Crow Tribe members were hunting elk when they crossed into the Bighorn National Forest in Wyoming. *Herrera*, 139 S. Ct. at 1693. Among them was Clayvin Herrera ("Mr. Herrera"). Mr. Herrera and the other members shot several bull elk and returned to the reservation with the meat. *Id.*

Wyoming charged Mr. Herrera for "taking elk off-season or without a state hunting license and with being an accessory to the same." *Id.* Mr. Herrera asserted that he was

7

entitled to hunt "where and when he did pursuant to the 1868 Treaty." *Id.* At trial he "was not permitted to advance a treaty-based defense, and" as a result, "a jury convicted him on both counts." *Id.* On appeal, the state appellate court found that the *Repsis* decisions had "issue-preclusive effect against Herrera because he is a member of the Crow Tribe, and the Tribe had litigated the *Repsis* suit on behalf of itself and its members." *Id.* at 1694. "Herrera, in other words, was not allowed to relitigate the validity of the treaty right in his own case." *Id.* The state intermediate court affirmed; the Wyoming Supreme Court denied review; and finally, the Supreme Court granted certiorari. *Id.*

The Supreme Court reversed and remanded the case—relying on *Minnesota v. Millie Lacs Band of Chippewa Indians* to repudiate *Race Horse*.[10] *See id.* at 1696 (citing 526 U.S. 172 (1999)). In effect, the Supreme Court adopted its earlier reasoning in *Millie Lacs* and subsequently held that the 1868 Treaty with the Crow Tribe—the same treaty at issue in this case—is not extinguished by statehood. *See id.* at 1695–97. The Court also held that "*Repsis* does not preclude Herrera from arguing that the 1868 Treaty right survived Wyoming's statehood." *Id.* at 1697–98.[11] In addition to rejecting the Statehood

---

[10] *Herera*, 139 S. Ct. at 1696 ("The Court further explained that '[t]he Race Horse Court's decision to the contrary'— that Wyoming's statehood did imply repeal of Indian treaty rights—'was informed by' that Court's erroneous conclusion 'that the Indian treaty rights were inconsistent with state sovereignty over natural resources.'" (quoting *Mille Lacs*, 526 U.S. at 207–08)).

[11] *Id.* at 1698 ("We conclude that a change in law justifies an exception to [issue] preclusion in this case. There is no question that the Tenth Circuit in *Repsis* relied on this Court's binding decision in *Race Horse* to conclude that the 1868 Treaty right terminated upon Wyoming's statehood. When the Tenth Circuit reached its decision in *Repsis*, it had no authority to disregard this Court's holding in *Race Horse* and no ability to predict the analysis this Court would adopt in *Mille Lacs*. *Mille Lacs* repudiated *Race Horse*'s reasoning. Although we recognize that it may be difficult at the margins to discern whether a particular legal shift warrants an exception to issue preclusion, this is not a marginal case. At a minimum, a repudiated decision does not retain preclusive force.") (citations omitted).

Holding, the *Herrera* Court also held that the creation of the Bighorn National Forest was not an "occupation" of the land as would have been contemplated by the parties to the Treaty.[12]

The Supreme Court concluded with two ways in which its decision was limited. *Id.* at 1703. First, it held that although the Bighorn National Forest is not considered to be "categorially occupied," Wyoming was entitled to argue that specific areas are "occupied" within the meaning of the Treaty. *Id.* Second, the Supreme Court held that the State was not foreclosed from arguing that "the application of state conservation regulations to Crow Tribe members exercising the 1868 Treaty right is necessary for conservation." *Id.*

Surprisingly, on remand the state trial court held that issue preclusion applied to *Repsis II*'s Occupation and Conservation Necessity Rationales. ECF No. 98-2 at 9. The trial court held that "issue preclusion bar[s] Mr. Herrera from 'arguing that he is immune from prosecution due to his Treaty Hunting right' based on the alternative rationales in *Repsis II*. *Id.* (quoting Aplt.'s App. at 81–83). Mr. Herrera appealed, and the intermediate appellate court reversed, finding that issue preclusion *did not* apply to *Repsis II*'s Occupation and Conservation Necessity Rationales:

> After holding that issue preclusion did *not* bar Mr. Herrera's arguments, the Wyoming appellate court remanded so the trial court could determine the "fact intensive questions" involving "site specific occupation and conservation necessity" through an evidentiary hearing without relying on *Repsis II*. The Wyoming Supreme Court denied review, letting the intermediate court's issue preclusion holding stand.

---

[12] *Id.* at 1702–03. ("Considering the terms of the 1868 Treaty as they would have been understood by the Crow Tribe, we conclude that the creation of Bighorn National Forest did not remove the forest lands, in their entirety, from the scope of the treaty.").

9

*Id.* at 12 (quoting Wyo. App. Decision, dated Dec. 3, 2021) (citations omitted).

## III.    Returning to *Repsis*

After the Wyoming trial court's decision in *Herrera*—but before the intermediate court reversed and the Wyoming Supreme Court denied review—the Crow Tribe filed this *Motion* seeking relief from judgment in *Repsis I* and Repsis *II* under Federal Rule of Civil Procedure 60(b). *Id.* at 9. We declined Wyoming's request to stay proceedings pending *Herrera*'s resolution and found the Tribe's motion was timely under Rule 60(c)(1). Then we addressed the Rule 60(b) motion. Regarding the Occupation and Conservation Necessity rationales, we held: "this Court cannot vacate the Tenth Circuit's conservation necessity [and occupation] holding[s because they were] not part of this Court's judgment and this Court has no authority to vacate a Tenth Circuit decision." ECF No. 84 at 19.

Crow Tribe appealed to the Tenth Circuit. *See* ECF No. 85. The Tenth Circuit found that this Court "erred in concluding that it was without authority to rule on the Tribe's Rule 60(b) motion," and continued, "we believe it is prudent to vacate the district court's decision and remand to allow the district court to evaluate the merits of the Tribe's Rule 60(b) motion in the first instance." ECF No. 98-2 at 27 (citation omitted).

The Tenth Circuit went on to instruct this Court how to proceed upon remand: "[T]he district court will be able to more thoroughly consider the parties' arguments concerning the Occupation and Conservation Necessity Rationales, including the recent issue preclusion holdings in the *Herrera* state court proceedings and the import of the Conservation Necessity Rationale in Bighorn National Forest." *Id.* at 28. And in a footnote,

the Tenth Circuit proposed that this Court "may hold an evidentiary hearing to determine whether Rule 60(b) relief is warranted." *Id.* n.6. ¶ 3.

Now that *Herrera* is resolved, and the Tenth Circuit has vacated and remanded this matter, this Court must now conduct an evaluation of the Tribe's motion for Rule 60(b) relief in the first instance. *See id.* at 27–28. To that end, a status conference was held on October 4, 2023 at 9:30 a.m. to determine whether an evidentiary hearing was necessary and what the scope of that hearing would be. *See* ECF No. 106. Counsel for parties agreed that a hearing would not be necessary and did not request to submit additional briefing. *Id.*

## IV. Parties' Arguments

### A. *The Tribe argues, in light of* Herrera, *it is entitled to relief from the judgments of* Repsis I *and* Repsis II.

The Tribe contends that it is entitled to relief pursuant to Federal Rule of Civil Procedure 60(b): "To allow this Court's *Repsis* judgment—which might have been correct when it was made, but now has been unequivocally repudiated by the Supreme Court—to bar the Crow Tribe and its members from legally exercising their off-reservation treaty hunting rights would be a profound injustice." ECF No. 70 at 8. Because *Repsis I* was based entirely on *Race Horse*, the Tribe argues that its repudiation opens the door for Rule 60 relief. *Id.* 11–12.

Similarly, the Tribe argues that the Tenth Circuit's *Repsis II* holding warrants vacatur. *Id.* at 13, 15. Although, the Tenth Circuit affirmed our holding and offered two additional rationales for affirmance, the Tribe contends that this is no bar to this Court's

11

power to grant relief. *Id.* at 15. For support, the Tribe cites to the seminal *Standard Oil* case. *Id.* at 13 ("The Supreme Court has held that a district court whose judgment was affirmed on appeal may grant Rule 60(b) relief without first seeking leave from the appellate court." (citing *Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 17 (1976))). "[T]he U.S. Supreme Court ha[s] 'held that a district court may entertain a Rule 60(b) motion without leave of the appellate court even when said judgment has been affirmed by said appellate court.'" *Id.* (quoting *Ramirez-Zayas v. Puerto Rico*, 225 F.R.D. 396 (D.P.R. 2005)).

As to the two additional rationales offered in *Repsis II*, the Tribe argues that those alternative bases for affirmance were not part of the judgment, and even if they were, this Court has the power to vacate those alternative rationales under Rule 60(b). *Id.* at 16. To start, the Tribe argues that the Occupation Rationale in *Repsis II* was reversed by *Herrera*. *Id.* "In *Herrera*, the Supreme Court, drawing on historical materials and interpreting the treaty language as the Crow Tribe would have understood it,…held that 'unoccupied' lands were those 'free of residence or settlement by non-Indians.'" *Id.* (quoting *Herrera*, 139 S. Ct. at 1701–02. As such, the creation of the Bighorn National Forest "did not remove the forest lands, in their entirety, from the scope of the treaty." *Herrera*, 139 S. Ct. at 1702-03.

Regarding the Conservation Necessity Rationale in *Repsis II*, the Tribe argues that the Tenth Circuit's remarks were not included "as an alternative holding, but instead merely appended it to its primary holding…." ECF No. 70 at 17. Further, the Tribe argues that even if the Tenth Circuit intended conservation necessity to serve as an alternative

12

holding, its articulation fails to pass muster under the summary judgment standard.[13]*Id.* at 17–18. And finally, the Tribe claims that the Tenth Circuit's failure to meaningfully discuss the three-factor conservation necessity test from *Antonine v. Washington*[14] further illustrates that conservation necessity was not intended to serve as part of its judgment. *Id.* at 18 ("The Tenth Circuit addressed only the first of these elements. There is no conservation necessity judgment in *Repsis II.*").

### B. Wyoming argues that the Tribe is not entitled to Rule 60(b) relief on the Occupation and Conservation Necessity Rationales in the Repsis II affirmance.

To start, Wyoming concedes that *Herrera*'s holding that the Tribe's treaty rights survived Wyoming's statehood "applies with equal force to the Crow Tribe" in *Repsis*. ECF No. 78 at 10. Accordingly, Wyoming argues that granting relief from the holding in *Repsis I* "would have no practical effect on the Crow Tribe or its members and is unnecessary."[15] *Id.* However, as far as *Repsis II*'s Occupation and Conservation Necessity Rationales go, Wyoming contends that the Tribe is not entitled to relief. *Id.* at 15. Wyoming's argument is essentially that "neither the *Repsis* [*II*] occupation holding nor the Supreme Court's holding in *Herrera* on occupation were based on *Race Horse*. Thus, the

---

[13] *Compare Repsis II*, 73 F.3d at 993 ("[T]here is ample evidence in the record to support the State's contention that its regulations were reasonable and necessary for conservation"), *with* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

[14] *See infra* p. 26.

[15] Wyoming does argue that this Court's *Repsis I* holding was not "based on" *Race Horse* as contemplated by Rule 60(b), and as such, Wyoming contends the Tribe is not entitled to relief from that judgment. ECF No. 78 at 13.

Crow Tribe can only prevail under Rule 60(b)(5) if prospective application of the occupation holding no longer remains equitable." *Id.*

Wyoming continues arguing that "[t]he only possible harm the Crow Tribe or its members could face from the *Repsis* [*II*] occupation holding is its possible issue-preclusive effect." *Id.* While the Supreme Court did not reach this issue in *Herrera*, Wyoming points to Justice Alito's dissent, which argued that the *Herrera* decision "will not prevent the Wyoming courts on remand in this case or in future cases presenting the same issue from holding that the *Repsis* [*II*] judgment binds all members of the Crow Tribe who hunt within the Bighorn National Forest. And…such a holding would be correct…." *Herrera*, 139 S. Ct. at 1709 (Alito, J., dissenting).

Next, Wyoming argues that the Tribe is not entitled to Rule 60(b) relief from the Conservation Necessity Rationale in *Repsis II*. "To prevail under Rule 60(b), the Crow Tribe must show 'severe hardships of extreme and unexpected nature' from the future application of the conservation holding. The *Repsis* [*II*] conservation holding currently has no harmful effect on the Crow Tribe or its members." ECF No. 78 at 19 (quoting *Ridley v. Phillips Petroleum Co.*, 427 F.2d 19, 22 (10th Cir. 1970). Wyoming argues its "conservation interests only come into play once the Crow Tribe's treaty rights are firmly established." *Id.* (citation omitted). Wyoming posits that "[u]ntil questions regarding occupation of the Bighorn National Forest are resolved, the Crow Tribe cannot show a harmful effect from the *Repsis* [*II*] conservation holding, let alone severe hardship." *Id.* at 20. And Wyoming concludes, even if the state court resolves conservation necessity in

14

favor of the Tribe, "Rule 60(b) is still not the appropriate vehicle for resolving the question." *Id.*

## LEGAL STANDARDS

### I.  Rule 60(b): An Extraordinary Remedy for Exceptional Circumstances

Pursuant to Federal Rule of Civil Procedure 60(b)(5), a movant may obtain relief from a final judgment if (i) "the judgment has been satisfied, released, or discharged;" (ii) "it is based on an earlier judgment that has been reversed or vacated;" or[16] (iii) "applying it prospectively is no longer equitable...." Fed. R. Civ. P. 60(b)(5). "Relief under Rule 60(b) is 'extraordinary and may only be granted in exceptional circumstances.'" *Manzanares v. City of Albuquerque*, 628 F.3d 1237, 1241 (10th Cir. 2010) (quoting *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005)). This rule provides district courts with "a grand reservoir of equitable power to do justice in a particular case." *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 446 (10th Cir. 2023) (citation and internal quotation marks omitted). The party seeking relief bears the burden of demonstrating it is warranted. *Horne v. Flores*, 557 U.S. 433, 447 (2009). And if they carry that burden, the court abuses its discretion if it fails to grant appropriate relief. *See Agostini v. Felton*, 521 U.S. 203, 215 (1997).

---

[16] *See Horne v. Flores*, 577 U.S. 433, 454 (2009) ("Use of the disjunctive 'or' makes it clear that each of the provision's three grounds for relief is independently sufficient....").

Under the second prong of Rule 60(b)(5), a judgment is not "based on" an earlier judgment when it was simply used as precedent. *Manzaneres*, 628 F.3d at 1240. Rather, relief is "limited to cases in which the present judgment is based on the prior judgment in the sense of res judicata or collateral estoppel." *Klein v. United States*, 880 F.2d 250, 258 n.10 (10th Cir. 1989).[17] Under the third prong of Rule 60(b)(5), the Court may grant relief from a judgment if its prospective application is no longer equitable. Fed. R. Civ. P. 60(b)(5). Simply put, for either prong, a judgment may be modified or vacated if a significant change in fact or law "renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo* v. *Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). And the changed circumstances in question must produce a "hardship so extreme and unexpected as to make the decree oppressive." *EEOC v. Safeway Stores*, 611 F.2d 795, 800 (10th Cir. 1975).

Additionally, Rule 60(b)(6) provides a catchall provision that permits vacatur or modification for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) "is even more difficult to attain and is only appropriate 'when it offends justice to deny such relief.'" *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999) (quoting *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 580 (10th Cir. 1996)). Additionally, Rule 60(b)(6) "is available only when the other grounds for relief specified in Rules 60(b)(1)–(5) are inapplicable." *Kemp v. United States*, 142 S. Ct. 1856, 1858 (2022).

---

[17] *See also Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645 (1st Cir. 1972) ("For a decision to be 'based on' a prior judgment within the meaning of Rule 60(b)(5), the prior judgment must be a necessary element of the decision, giving rise, for example, to the cause of action or a successful defense.").

16

## II. The Indian Canons of Construction[18]

As one can imagine, treaty negotiations between American Indian tribes and the United States Government were hardly conducted on a level playing field.[19] An inherent disparity in bargaining power, translational limitations, and acutely different worldviews often culminated prejudicial results.[20] Seeking to rectify this, the Supreme Court has endeavored—beginning with Chief Justice John Marshal—to interpret treaty language deferentially using the "Indian canons of construction." *See, e.g., Worcester*, 31 U.S. at 550–56; *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 174 (1973); *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970); *Mille Lacs*, 526 U.S. at 196. At their core, the canons require:

> [T]reaties, agreements, statutes, and executive orders [to] be liberally construed in favor of the Indians and that all ambiguities are to be resolved in their favor. In addition, treaties and agreements are to be construed as the Indians would have understood them, and tribal property rights and sovereignty are preserved unless Congress's intent to the contrary is clear and unambiguous.

---

[18] Although we do not have occasion to use the Indian canons of construction in this order, we find a brief discussion of them is appropriate considering their renaissance in recent Supreme Court cases. *See e.g., Herrera*, 139 S. Ct. at 1696–1702; *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020); *Wash. State Dep't of Licensing v. Cougar Den*, 139 S. Ct. 1000 (2019).

[19] *See* Sammy Matsaw, Dylan Hedden-Nicely & Barbara Cosens, *Cultural Linguistics and Treaty Language: A Modernized Approach to Interpreting Treaty Language to Capture the Tribe's Understanding*, 50 ENVTL. L. 415, 418–19 (2020) ("For the first half of the United States' existence…the preferred method of colonizing North America was through government-to-government agreements: treaties and congressionally ratified agreements. At their core, the bargain struck in those agreements was simple; the United States wanted Indian land and Indian people wanted to preserve their way of life. Nonetheless, courts have struggled to give meaning to these agreements. Negotiators spoke different languages, and because these agreements were always drafted in the language of the colonizer, it is far from clear that actual treaty terms matched tribal intent. The stark difference in worldviews between colonizing and Indigenous peoples, and the privileging of the English language, combined to distort meaning in the English translation. Invariably, federal negotiators were, at best, recording what they thought the Indians were trying to tell them, most likely what they thought was best for the Indians, and—at worst—drafting the terms to the detriment of the tribes.").

[20] *See id.* at 419.

COHEN'S HANDBOOK § 2.02, at 113–14. These principles require courts to "look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id.* (quoting *Mille Lacs*, 526 U.S. at 196) (internal quotation marks omitted); *see Herrera*, 139 S. Ct. at 1690 ("[T]reaty terms are construed as they would naturally be understood by the Indians.").

## DISCUSSION[21]

The undercurrent sustaining this action remains the ostensibly incongruous nature of treaty hunting rights and state sovereignty. And while this bitter discourse between Wyoming and the Tribe spans decades, our task in this case is more constrained. As the Tenth Circuit has instructed us, its alternative grounds for affirmance in *Repsis II* do not hinder us from granting Rule 60(b) relief: "We conclude the district court had the authority to review the Tribe's motion for post-judgment relief—specifically, insofar as that motion implicated the Occupation Rationale and the Conservation Necessity Rationale." ECF No. 98-2 at 24. Therefore, our analysis is confined to the Statehood Holding, the Occupation Rationale, and the Conservation Necessity Rationale. We shall address each in turn.

**I. After *Herrera* the Statehood Holding in *Repsis I* and *Repsis II* no longer stands as a barrier to the Tribe's exercise of Treaty hunting rights.**

---

[21] The Tenth Circuit affirmed our holding that the Tribe's Rule 60(b) *Motion* was timely. As such, we will not discuss the timeliness issues as briefed by the parties. Additionally, we previously held that abstention was improper in this matter, and what's more, the Tenth Circuit noted that "Wyoming...expressly abandoned its abstention arguments in [its] appeal." ECF No. 98-2 at 10 n.2 (citing Aplees.' Resp. Br. at 13 n.3). As such, we shall not address Wyoming's abstention arguments here.

18

In *Herrera*, the Supreme Court, once and for all, foreclosed the Statehood Holding as a basis for extinguishing the Tribe's off-reservation hunting rights. *Herrera*, 139 S. Ct. at 1697, 1700 ("[T]reaty-protected rights 'are not impliedly terminated upon statehood.'" (quoting *Mille Lacs*, 526 U.S. at 207)). Embracing the Indian canons of construction, the *Herrera* Court reaffirmed *Mille Lacs*' holding that treaty abrogation requires explicit congressional action. *Id.* at 1698 ("There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" (quoting *Mille Lacs*, 526 U.S. at 202–03)).

Following that holding, we previously determined "[t]here is no reason to grant relief from [the Statehood Holding] because it no longer stands as a barrier to the exercise of treaty hunting rights." ECF No. 84 at 16. As such, we declined to vacate *Repsis I* under Rule 60(b)(5) or (b)(6).[22] The Tribe did not appeal this part of our prior order nor did the Tenth Circuit address it. *See* ECF No. 98-2 at 11 n.3.[23] As counsel for the Tribe noted in the October 4, 2023 hearing, the Tribe feels that clarification from this Court was sufficient to protect its interests. *See* ECF No. 106. As such, we reiterate that the Statehood Holding (in *Repsis I* and *Repsis II*) can no longer serve as a basis for the abrogation or termination

---

[22] We found that the Statehood Rationale holding was not sufficiently "based on" *Race Horse* for purposes of Rule 60(b)(5) relief: "Plaintiffs were able to litigate the issues; they were not prevented from doing so because of res judicata or collateral estoppel arising from *Race Horse*. Despite the similar facts and issues in the cases, *Race Horse* did not involve the same tribe or privity and did not prevent Plaintiffs from arguing their positions in front of this Court." ECF No. 84 at 16. And as to Rule 60(b)(6) relief, we found that because *Repsis I* had been repudiated by *Herrera*, relief under (b)(6) was unnecessary. *Id.*

[23] *See also* ECF No. 78 at 14 ("Wyoming concedes that the primary holding in *Repsis* that the Crow Tribe's hunting right was abrogated by statehood no longer binds the Tribe and cannot be applied in future cases.").

19

of the Tribe's Treaty-based hunting rights. *Herrera*, 139 S. Ct. at 1697 (holding Wyoming's statehood did not extinguish the Tribe's 1868 Treaty hunting rights).

## II. Although *Repsis II*'s Occupation Rationale was not "based on" *Race Horse*, we find Rule 60(b)(5) still provides relief.

The Occupation Rationale, as offered in *Repsis II*, is the notion that "the creation of the Big[horn] National Forest resulted in the 'occupation' of the land" as contemplated in the Treaty. 73 F.3d at 993. The *Herrera* Court—invoking the canons to interpret the Treaty's language as the Tribe would have understood it—expressly rejected the Occupation Rationale, holding that the "Bighorn National Forest did not become categorically 'occupied' within the meaning of the 1868 Treaty when the national forest was created." *Herrera*, 139 S. Ct. at 1700–01. Although we did not reach the Occupation Rationale in *Repsis I*, the Tenth Circuit did in its affirmance. And despite the Tribe's arguments to the contrary, we previously held that the Occupation Rationale is part of the *Repsis II* judgment.[24] Based on that ruling, we now address the Tribe's motion for Rule 60(b)(5) and (6) relief in the first instance.

Wyoming argues that we cannot vacate the Occupation Rationale holding from *Repsis II* because it was not "based on" *Race Horse* as required under the second prong of Rule 60(b)(5). We agree. The Tenth Circuit's alternative basis for affirmance is not based

---

[24] ECF No. 84 at 17 ("Despite the fact this Court did not address occupation in its judgment, the Tenth Circuit was entitled to affirm this Court's judgment on any grounds 'for which there is a record sufficient to permit conclusions of law....' *Repsis [II]*, 73 F.3d 982 at 993 (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)). The Tenth Circuit addressed the Bighorn National Forest occupation as an alternative holding. *Repsis[II]*, 73 F.3d 982 at 993. Thus, it was clearly part of the Tenth Circuit's decision affirming this Court's judgment, even though this Court did not address occupation in its judgment.").

on *Race Horse* in the sense of res judicata or collateral estoppel; rather, the Occupation Rationale turns on the Tenth Circuit's interpretation of when the Bighorn National Forest became occupied.[25] However, we find the third prong of Rule 60(b)(5) provides relief.

To start, we hold that applying *Repsis II*'s Occupation Rationale prospectively, post-*Herrera*, would be inequitable. *See* Fed. R. Civ. P. 60(b)(5). To the extent that *Repsis II* held that the Bighorn National Forest was categorically occupied by its designation, thus extinguishing the Crow's Treaty hunting rights, we shall vacate. As the third prong of Rule 60(b)(5) requires, there has been a substantial change in law—*i.e.*, *Herrera*'s outright reversal or *Repsis II*'s Occupation Rationale. *Compare Repsis II*, 73 F.3d at 993 ("[T]he creation of the Big[horn] National Forest resulted in the 'occupation' of the land."), *with Herrera*, 139 S. Ct. at 1692 ("[T]he lands within Bighorn National Forest did not become categorically 'occupied' when set aside as a national reserve."); *see Horne*, 557 U.S. at 447. Additionally, continuing to enforce such a judgment only serves as a hindrance upon the Treaty hunting rights clearly resurrected by *Herrera*. *See Herrera*, 139 S. Ct. at 1694; *contra Repsis II*, 73 F.3d 982. We find such a result to be detrimental to public interest and oppressive to the Tribe. *See Horne*, 557 U.S. at 447; *see EEOC*, 611 F.2d at 800.

Even though the intermediate state court found *Repsis II*'s Occupation and Conservation Necessity Rationales did not have issue-preclusive effect on Mr. Herrera, the

---

[25] The Tenth Circuit cited to Congress' creation of the Bighorn National Forest in 1897 and the Multiple-Use Sustained Yield Act of 1960 as evidence that the lands were no longer unoccupied. *Repsis II*, 73 F.3d at 993 (citing Act of June 4, 1897, Ch. 2, 30 Stat. at 35–36 (1897)). We note now, as the *Herrera* Court did, that the Tenth Circuit's Occupation Rationale completely ignored the Indian canons of construction and failed to discuss how the tribe would have understood "occupation" of the lands—merely asserting the forgone conclusion that the forest's designation equated to occupation.

implications of the Occupation Rationale in *Repsis II* extend further.[26] While Wyoming argues that the state court's ruling means the Occupation Rationale no longer binds the Crow Tribe or its members (ECF No. 78 at 14), we agree with the Tribe that "the potential scope of the *Repsis [II]* judgment reaches beyond the Wyoming state courts. The Crow Tribe's treaty hunting lands include parts of Wyoming, Montana, and the Dakotas." ECF No. 79 at 3. And therefore, "[o]nly this Court's partial vacatur of the *Repsis* judgment can relieve [the Tribe] from having to re-litigate what the Supreme Court has already determined—that the Crow Tribe's off-reservation treaty hunting right remains intact, and that the creation of a national forest does not categorically 'occupy' those lands." *Id.*

Because *Herrera* repudiated *Repsis II*'s Occupation Rationale, and allowing that judgment to stand is inequitable, vacatur is proper. And now, we affirmatively state the Occupation Rationale, as articulated in *Repsis II*, cannot serve as a bar to the Tribe's 1868 Treaty hunting rights.

In finding that the third prong of Rule 60(b)(5) provides relief, we needn't reach the issue of whether relief under Rule 60(b)(6)'s catchall provision would be warranted. But assuming, *arguendo*, that (b)(5) was inapplicable, we find vacatur under (b)(6) could also provide relief. As the Supreme Court held in *Agostini*, "intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Agostini*, 521 U.S. at 239. And as the Tenth Circuit has noted, "[o]ur

---

[26] *See Herrera v. Wyoming*, CV-2020-273, slip op. at 6 (Wyo. Dist. Ct. Dec. 3, 2021) ("Because there have been multiple changes in the applicable legal context since the *Repsis [II]* decision was issued, it was improper to apply issue preclusion to either the occupation or conservation necessity 'holdings' of that case.").

22

precedents remain good law unless the Supreme Court has 'indisputably and pellucidly' abrogated them." *FTC v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1051 (10th Cir. 2024) (quoting *Vincent v. Garland*, 80 F.4th 1197, 1200, 1202 (10th Cir. 2023)). However, when precedent is expressly repudiated and allowing the judgment to stand would offend justice, "new Supreme Court opinions can sometimes support vacatur under Rule 60(b)(6)." *Id.* A narrow exception to be sure, but we find it applicable here. *Herrera* "indisputably and pellucidly" abrogated *Repsis II*'s Occupation Rationale holding. In our estimation, allowing *Repsis II*'s alternative holding to further stand as a barrier to the Tribe's hunting rights post-*Herrera* serves no equitable purpose and offends justice. *See Yapp*, 186 F.3d at 1232. But as noted, in finding that vacatur is warranted under Rule 60(b)(5), we needn't exhaustively discuss why vacatur would be warranted under (b)(6).

However, we note that the vacatur of the Occupation Rationale does not foreclose Wyoming from arguing that site-specific areas of the Bighorn National Forest are "occupied" (as would have been understood by the Crow at the time of the Treaty). *See Herrera*, 139 S. Ct. at 1703 (holding that while categorical occupation was repudiated, Wyoming may argue the section of the Bighorn National Forest where Mr. Herrera was hunting elk was "occupied" within the meaning of the 1868 Treaty).

## III. The Conservation Necessity Rationale does not require vacatur.

The Conservation Necessity Rationale, also proffered in *Repsis II*, stands for the proposition that—treaty-based rights notwithstanding—states have the "authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing,

23

and gathering rights in the interest of conservation." *Mille Lacs*, 526 U.S. at 204–05 (quoting *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 765, n.16 (1985)); *see also Puyallup Tribe v. Dep't of Game* (*Puyallup I*), 391 U.S. 392, 398 (1968) (noting that while states may impose a variety of restrictions in the name of conservation, such standards mustn't discriminate against the Indians); *e.g., Dep't of Game v. Puyallup Tribe* (*Puyallup II*), 414 U.S. 44, 49 (1973) ("The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.").[27]

As the Tenth Circuit notes in *Repsis II*, "if the Treaty with the Crows, 1868, had reserved a continuing right which had survived Wyoming's admission, we hold there is ample evidence in the record to support the State's contention that its regulations were reasonable and necessary for conservation." *Repsis II*, 73 F.3d at 993. This is, in essence, the entirety of *Repsis II*'s Conservation Necessity Rationale. We question, as the Tribe does, whether this brief remark is part of the *Repsis II* judgment. The conditional language and lack of analysis seems to suggest *obiter dictum*.[28] Lending support to this suspicion,

---

[27] *See also* Case Note, *The Sovereign Self-Preservation Doctrine in Environmental Law*, 133 HARV. L. REV. 621, 623–25 (2019) ("The doctrine of conservation necessity is best justified on state sovereignty grounds: either as a prosovereign canon of treaty interpretation or as an affirmative limit on the reach of the treaty power, deriving from the state's sovereign rights to its own resources. The state sovereignty rationale permeates the Supreme Court's conservation necessity cases.").

[28] *Obiter dictum*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)."); *Obiter Dictum*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("[A]n opinion expressed by a judge in discussing a point of law or in giving a judgment, which is not essential to the decision, and which therefore lacks binding authority."); *see Tokoph v. United States*, 774 F.3d 1300, 1303 (10th Cir. 2014) ("As we have also stated, dicta are statements and comments in an opinion concerning some rule of law or legal proposition

the *Repsis II*'s discussion of conservation is qualified. That is, the Tenth Circuit noted that while it has previously "recognized that states may regulate off-reservation treaty rights in the interest of conservation" in the context of *Repsis II*, "this is not our case." *Id.* at 992 (citations and internal quotation marks omitted) (suggesting the Conservation Necessity Rationale was not at issue in *Repsis II* because Wyoming's statehood repealed the Tribe's Treaty rights). Additionally, as the Tribe points out, the Tenth Circuit's truncated comments do not meet the appropriate summary judgment standard nor do they address all of the requisite elements for a conservation necessity finding. ECF No. 70 at 23–24.

But regardless of whether the Tenth Circuit's Conservation Necessity Rationale was part of its judgment or merely *dictum*, we find that to be of little consequence to the Tribe's hunting rights going forward. As the Tenth Circuit noted, "Wyoming argues that Rule 60(b) relief is unnecessary because the Conservation Necessity Rationale is retroactive only— i.e., the holding is 'limited to the facts of' the specific prosecution of Mr. Ten Bear in *Repsis.*" ECF No. 98-2 at 28 n.6. (quoting Oral Arg. At 22:55–26:00). We agree with this contention. That is, even if the Conservation Necessity Rationale is part of the *Repsis II* judgment, we do not find it has any preclusive effect on Crow Tribe members' Treaty hunting rights generally; meaning, the Conservation Necessity Rationale—as espoused in *Repsis II*—cannot preclude Tribe members from asserting a Treaty-based hunting rights

---

not necessarily involved nor essential to determination of the case in hand.") (citations and internal quotation marks omitted); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

defense in other cases.[29] Therefore, Rule 60(b) relief is not warranted or needed as to the Conservation Necessity Rationale.

For completeness' sake, we note that just as Wyoming's authority to limit hunting rights is not unlimited nor are the Tribe's usufructuary rights. Meaning, Wyoming may enact reasonable limits on the Tribe's Treaty-based hunting rights in the name of conservation; but such regulations must meet the threefold requirement found in *Antoine v. Washinton*: (i) the regulation must be reasonable and necessary for conservation purposes; (ii) the regulation's application to the affected Indian population is necessary to the conservation interest; and (iii) the regulation does not discriminate against the affected Indian population. 420 U.S. 194, 207 (1975). Looking forward, Wyoming and the Tribe should endeavor to strike a balance between treaty-based usufructuary rights and state sovereignty over natural resources, for as the Supreme Court has held, the two are necessarily compatible. [30]

## CONCLUSION

Based upon the preceding, Plaintiffs' *Motion* (ECF No. 69) is **HEREBY GRANTED IN PART**. As such, we now **VACATE** the Occupation Rationale as found in *Repsis II* under Federal Rule of Civil Procedure 60(b)(5). And further, we hold that the

---

[29] *See Herrera v. Wyoming*, CV-2020-273 slip op. at 5 n.1 (Wyo. Dist. Ct. Dec. 3, 2021) ("The State has the burden of proving that each and every regulation it intends to apply to treaty hunters meets the conservation necessity standard. In other states where treaties have been found to be valid, the hunting and fishing regulations are often reviewed and revised on an annual basis to ensure compliance with the conservation necessity standard. This constitutes a separate reason for finding that issue preclusion should not have been applied to the conservation necessity 'holding' in *Repsis II*.").

[30] *See supra* note 6.

Statehood Rationale and Conservation Necessity Rationale are no barrier to the Crow Tribe's 1868 Treaty hunting rights.

. Dated this 28th day of March, 2024.

Alan B. Johnson
United States District Judge

27